UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - against - | : | 18 Cr. 36 (JPO) |
| DAVID MIDDENDORF, *et al.*, | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DAVID MIDDENDORF'S MOTION FOR A JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE, OR, ALTERNATIVELY, FOR A NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

PETRILLO KLEIN & BOXER LLP
655 Third Avenue
New York, NY 10017

BRUCH HANNA LLP
1099 New York Ave., NW
Washington, DC 20001

*Attorneys for David Middendorf*

**TABLE OF CONTENTS**


PRELIMINARY STATEMENT .......... 1

BACKGROUND .......... 1

LEGAL STANDARD .......... 5

A. Rule 29 .......... 5

B. Rule 33 .......... 7

C. Wire Fraud .......... 8

ARGUMENT .......... 9

I. THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29 .......... 9

A. The Trial Evidence Was Insufficient to Prove that Mr. Middendorf Willfully Violated the Wire Fraud Statute as Charged in Counts Two through Five .......... 9

B. The Government Did Not Prove that Mr. Middendorf Aided and Abetted Any PCAOB Employees' Acts of Embezzlement, and Mr. Middendorf Should Be Acquitted of Counts Three, Four, and Five .......... 13

C. The Government's Proof Failed to Establish that the PCAOB Information at Issue is "Property" .......... 18

1. The PCAOB's information is not "property" because it is regulatory in character.... 18

2. The PCAOB's information is not "property" because it is not treated confidentially. 19

II. THE COURT SHOULD GRANT A NEW TRIAL PURSUANT TO RULE 33 .......... 22

A. The Government's Conduct Regarding Defense Witness Jay Hanson Resulted in a Manifest Injustice Requiring a New Trial .......... 22

1. Relevant Facts .......... 23

2. The Court Should Hold an Evidentiary Hearing to Explore the Reason for the Contrast Between Hanson's Testimony and His Prior Statements .......... 29

3. The Government's *Ex Parte* Submission Denied Mr. Middendorf the Oppurtunity to Challenge the Grounds for Cross-Examination and Effectively Confront Hanson .......... 31

4. The Prosecutor's Remarks in Rebuttal Compounded the Prejudice Suffered by Mr. Middendorf .......... 32

B. The Prosecutor's Improper Remarks During Rebuttal Summation Created a Manifest Injustice Requiring a New Trial .......... 34

C. Mr. Middendorf Is Entitled to a New Trial Due to Instructional Error .......... 36

1. The Court's Wire Fraud Instruction Was Erroneous. .......... 36

2. The Court Improperly Omitted a Materiality Instruction .......... 39

3. The Court's Willfulness Instruction Was Improper and Contrary to the Law of this Circuit. .......... 40

4. The Court Should Have Instructed the Jury on Multiple Conspiracies .......... 43

VI. CONCLUSION .......... 46

# TABLE OF AUTHORITIES

**Cases**


*Cleveland v. United States*, 531 U.S. 12 (2000) .......... 2,19

*Floyd v. Meachum*, 907 F.2d 347 (2d Cir. 1990).......... 7, 34

*Neder v. United States*, 527 U.S. 1 (1999).......... 39

*Ogletree v. Graham*, 559 F. Supp. 2d 250 (N.D.N.Y. 2008).......... 34

*Pasquantino v. United States*, 544 U.S. 349 (2005) .......... 8

*Rosemond v. United States*, 134 S. Ct. 1240 (2014) .......... 14

*United States v. Afriyie*, 16 Cr. 377 (S.D.N.Y.) (Dkt. 83) .......... 41

*United States v. Ali*, 561 F. Supp. 2d 265 (E.D.N.Y. 2008) .......... 9

*United States v. Alkins*, 925 F.2d 541 (2d Cir. 1991) .......... 44

*United States v. Altman*, 48 F.3d 96 (2d Cir. 1995).......... 8

*United States v. Blaszczak*, 17 Cr. 357 (S.D.N.Y.).......... 41

*United States v. Cassese*, 290 F. Supp. 2d 443 (S.D.N.Y. 2003) .......... 6, 11

*United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72 (2d Cir. 2014).......... 7

*United States v. Clark*, 740 F.3d 808 (2d Cir. 2014) .......... 5

*United States v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997).......... 37

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994).......... 6

*United States v. Docherty*, 468 F.2d 989 (2d Cir. 1974) .......... 14

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001).......... 7

*United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011).......... 8

*United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017).......... 8

*United States v. Freeman*, 498 F.2d 569 (2d Cir. 1974) ........................................................... 14

*United States v. Friedman*, 909 F.2d 705 (2d Cir. 1990) ........................................................... 34

*United States v. Galanis,* No. 16 Cr. 371 (RA), 2018 WL 5999637 (S.D.N.Y. Nov. 15, 2018) 7, 8

*United States v. Gjurashaj*, 706 F.2d 395 (2d Cir. 1983) ........................................................... 6

*United States v. Handakas*, 286 F.3d 92 (2d Cir. 2002) ............................................................. 8

*United States v. Huff*, No. 12 Cr. 750 (NRB), 2015 WL 463770 (S.D.N.Y. Feb. 4, 2015)............ 9

*United States v. Jones*, 16 Cr. 553 (S.D.N.Y.) (Dkt. 125) ......................................................... 41

*United States v. Jones*, 393 F.3d 107 (2d Cir. 2004) ................................................................ 10

*United States v. Massa*, 740 F.2d 629 (8th Cir. 1984)............................................................... 41

*United States v. Mbacke*, No. 18 Cr. 237 (SJB), 2018 WL 3545499 (E.D.N.Y. July 20, 2018).... 6

*United States v. McDermott*, 245 F.3d 133 (2d Cir. 2001) ......................................................... 44

*United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3443117 (S.D.N.Y. July 17, 2018) 3

*United States v. Mulheren*, 98 F.2d 364 (2d Cir. 1991)) ............................................................ 6

*United States v. Nusraty*, 867 F.2d 759 (2d Cir. 1989)............................................................... 11

*United States v. Percoco*, 317 F. Supp. 3d 822 (S.D.N.Y. 2018) .................................................. 7

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) ................................................................ 14

*United States v. Richter*, 826 F.2d 206 (2d Cir. 1987)............................................................... 34

*United States v. Sampson*, 898 F.3d 270 (2d Cir. 2018).................................................. 37, 40, 41

*United States v. Schwartz*, 924 F.2d 410, (2d Cir. 1991)........................................................... 19

*United States v. Stevens*, 210 F.3d 356, 2000 WL 419938 (2d Cir. 2000) .................................. 40

*United States v. Tagliaferri*, 13 Cr. 115 (S.D.N.Y.) (Dkt. 89)............................................... 41, 42

*United States v. Taylor*, 816 F.3d 12 (2d Cir. 2016)............................................................... 5, 6

*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015)........................................................... 5, 8, 11

*United States v. Williams*, 02 Cr. 1372 (ALC), 2017 WL 3613661 (S.D.N.Y. Aug. 21, 2017)... 30

**Statutes**

18 U.S.C. § 1343.................................................................................................................. 2, 8
18 U.S.C. § 371.................................................................................................................... 1, 2
18 U.S.C. § § 2........................................................................................................................ 2

**Rules**

Fed. R. Crim. P. 29 ............................................................................................................ 5, 7
Fed. R. Crim. P. 33 ................................................................................................................. 7

**Other Authorities**

N.Y. Rule of Professional Conduct, 1.4(a)(3) ..................................................................... 30
Sand et al., *Modern Federal Jury Instructions*, Instr. 44-4, 44-5 ........................................... 39, 41

Defendant David Middendorf respectfully submits this memorandum of law in support of his motion for a judgment of acquittal on Counts Two through Five of the Indictment pursuant to Federal Rule of Criminal Procedure 29, or, alternatively, for a new trial pursuant to Federal Rule of Criminal Procedure 33.[1] Mr. Middendorf also joins in the motions filed by his co-defendant Jeffrey Wada, and adopts the arguments made therein to the extent they are applicable to him.

## PRELIMINARY STATEMENT

No reasonable jury could conclude, based on the evidence presented at trial, that Mr. Middendorf intended to commit wire fraud, or that he agreed with others to commit wire fraud. Specifically, no reasonable jury could conclude that Mr. Middendorf solicited stolen PCAOB information from Brian Sweet or any other former or current PCAOB employee, in breach of that employee's duty of confidentiality under the PCAOB ethics rules. In addition, the government's proof failed to establish that the information at issue – allegedly confidential PCAOB information about inspections – constitutes property within the meaning of the wire fraud statute. Accordingly, Mr. Middendorf is entitled to a judgment of acquittal on Counts Two through Five of the Indictment.

In the alternative, Mr. Middendorf should be granted a new trial due to the government's successful intimidation of a critical defense witness, by means kept secret from the defense, because of the government's improper rebuttal summation, and because of error in the Court's jury instructions.

## BACKGROUND

The Indictment charged Mr. Middendorf with engaging in a conspiracy to defraud the United States Securities and Exchange Commission ("SEC"), in violation of 18 U.S.C. § 371

[1] Mr. Middendorf was acquitted of Count One, conspiracy to defraud the United States.

(Count One); and with defrauding and conspiring to defraud the Public Company Accounting Oversight Board ("PCAOB") of its property in the form of confidential information, in violation of 18 U.S.C. §§ 2, 1343, and 1349 (Counts Two through Five, the "Wire Fraud Counts"). In general, the Indictment alleged that Mr. Middendorf and others agreed to and did obtain confidential information from the PCAOB about the identities of the public company audits that the PCAOB planned to examine during its annual inspections of KPMG, and used that information to affect the results of those inspections. *See, e.g.*, Indictment ¶ 27.

Mr. Middendorf moved to dismiss the Indictment in April 2018, arguing that the alleged conduct, even if proven, did not constitute a violation of 18 U.S.C. § 371 or wire fraud. Dkt. Nos. 53-60. In a joint submission, Mr. Middendorf and his co-defendants argued (1) that Count One failed to allege any fraudulent conduct directed at the SEC and further failed to allege that the Defendants targeted their alleged fraud at impeding any particular SEC function; and (2) that the PCAOB's confidential information was regulatory in character and consequently not "property" under the wire fraud statute pursuant to *Cleveland v. United States*, 531 U.S. 12 (2000). *See generally* Dkt. No. 57. In a separate submission, Mr. Middendorf further argued that Counts Two through Five of the Indictment failed to state wire fraud offenses because the Indictment did not allege that Mr. Middendorf knowingly and willfully embezzled (or aided or abetted the embezzlement of) information from the PCAOB or otherwise made materially false representations or omissions to the PCAOB, as required by 18 U.S.C. § 1343. Dkt. No. 59.

The Court denied the motions to dismiss, finding in relevant part that the PCAOB's confidential information was "property" within the meaning of the wire fraud statute, and that the Indictment fairly alleged that all five defendants participated in the charged scheme to embezzle that information, while noting that "[w]hether the government can prove that such a

scheme to embezzle existed and that the Defendants are culpable—either directly or as aiders and abettors—for the fraudulent scheme is a question for trial." *United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3443117, at *9-10 (S.D.N.Y. July 17, 2018).

Beginning in early February 2018, the government produced Rule 16 discovery to the defendants. Discovery continued on a rolling basis throughout the pendency of the case, including on a near daily basis soon before and throughout the trial. Specifically, the government made approximately 50 separate Rule 16 productions between February 2018 and March 2019, including approximately 16 productions during the trial itself. For example, in early January 2019, the defendants moved *in limine* to preclude testimony on the subject of the PCAOB's purported "costs" for replanning the 2017 inspection list and conducting ten 2016 replacement inspections. At that point in time, the defense had not received any documents in discovery relating to the PCAOB's costs. *See* Dkt. 160 at 3. On January 23, more than two weeks after the filing of the Defendants' motion *in limine*, the government produced approximately 100 PCAOB documents, including some contained in a folder labeled "Cost Estimates." One of these documents contained calculations regarding the PCAOB's total costs. *See* Dkt. 239 at 9. On February 13, after the start of the trial, the government produced additional cost-related documents that it had received that morning from the PCAOB. On February 22, at the end of the second week of trial, the government produced 59 documents consisting of five PCAOB compensation summaries and four excel spreadsheets relating to "planning hours" for the 2015, 2016, and 2017 inspections, and marked a selection of those documents as Government Exhibits ("GX") 131-135. This production was made more than one year after the original Rule 16 discovery deadline in the case. *See* Tr. 6-8 (1/25/18).

Following the multi-month discovery process and the filing of extensive motions *in limine*, Mr. Middendorf and his co-defendant Jeffrey Wada stood trial, beginning with jury selection on February 11, 2019, and concluding with a jury verdict on March 11, 2019.[2] As to Mr. Middendorf, the jury returned a verdict of acquittal on Count One and verdicts of guilty on Counts Two through Five, the Wire Fraud Counts.

In its case in chief, as relevant to Mr. Middendorf, the government called as witnesses (a) two former KPMG employees, Brian Sweet and Tom Whittle, both of whom both pleaded guilty pursuant to cooperation agreements with the government; (b) four current PCAOB employees, including the current U.S. team leader for KPMG inspections at the PCAOB, Stephanie Rodriguez, the PCAOB's Ethics Officer, Barbara Hannigan, and two employees with administrative functions relating to payroll and scheduling of employees' workload; (c) three current KPMG employees, including one of Mr. Middendorf's direct reports, Laurie Mullen, and KPMG partners Dave Marino and Diana Kunz; (d) a forensic analyst with the United States Secret Service; and (e) the Chief Accountant of the SEC, Wesley Bricker. The government also offered in evidence emails and other documents produced by the PCAOB, KPMG, and the SEC, phone records, text messages, photographs, and other electronic evidence, including "notes" data extracted from Mr. Middendorf's cellphone.

In the defense case, Mr. Middendorf presented the testimony of five witnesses, including a character and fact witness who testified regarding audit committee reliance on PCAOB inspection reports, a former PCAOB board member, Jay Hanson, two expert witnesses, a summary chart witness, and Mr. Middendorf also testified in his own defense. Mr. Middendorf also offered certain emails and other documents.

[2] Mr. Britt was severed prior to trial.

In its rebuttal case, the government admitted two exhibits.

## LEGAL STANDARD

### A. Rule 29

Pursuant to Rule 29(a), "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). After a jury verdict, Rule 29(c) permits the court to "set aside the [guilty] verdict and enter an acquittal." Fed. R. Crim. P. 29(c).

In considering a motion for a judgment of acquittal pursuant to Rule 29, a court views the evidence in the light most favorable to the government with all reasonable inferences resolved in the government's favor. *See, e.g.*, *United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014). This standard does not, however, mean that all jury verdicts must stand. *See, e.g.*, *id.* at 812-13 (conviction not supported by sufficient evidence); *United States v. Valle*, 807 F.3d 508, 523 (2d Cir. 2015) (same); *United States v. Taylor*, 816 F.3d 12, 22 (2d Cir. 2016) ("no rational jury could conclude beyond a reasonable doubt" that the defendant had the requisite intent). Indeed, the Constitution requires that "no person may be convicted unless the Government has proven guilt beyond a reasonable doubt," and courts "must take seriously [the] obligation to assess the record to determine . . . whether a jury could *reasonably* find guilt beyond a reasonable doubt." *Clark*, 740 F.3d at 811 (emphasis in original); *see also Valle*, 807 F.3d at 513 (noting court's "responsibility to ensure that the government satisfies its burden of establishing proof beyond a reasonable doubt"). A jury verdict must be based on more that "any evidence that arguably could support a verdict," because "[i]n any criminal trial there is always some evidence of guilt, otherwise there could not have been a prosecution." *Valle*, 807 F.3d at 515 (affirming decision

that "notwithstanding the jury's verdict . . . the prosecutors had failed to prove beyond a reasonable doubt that [the defendant] . . . had entered into a conspiracy . . . or . . . had formed the required specific intent.") In short, the government "must do more than introduce evidence 'at least as consistent with innocence as with guilt.'" *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)).

"Where the government has failed to present proof of an essential element of the crime, a judgment of conviction must be reversed and the indictment dismissed." *United States v. Gjurashaj*, 706 F.2d 395, 398 (2d Cir. 1983) (reversing convictions on one count of indictment and dismissing that count). Thus, under Second Circuit precedent, motions for acquittal are properly granted where there is insufficient evidence of criminal intent. *See, e.g.*, *Taylor*, 816 F.3d at 22 (vacating counts of conviction where there was insufficient proof of intent); *D'Amato*, 39 F.3d at 1256-57; *Mulheren*, 938 F.2d at 366, 368-69. Where the evidence offered in support of criminal intent provides "equal or nearly equal circumstantial support for the competing inferences of innocence and guilt . . . . [the evidence] mandate[es] acquittal." *United States v. Cassese*, 290 F. Supp. 2d 443, 452 (S.D.N.Y. 2003) (internal quotations and citations omitted).

Acquittal is likewise required where "the record was devoid of necessary predicates of the charged crime." *United States v. Mbacke*, No. 18 Cr. 237 (SJB), 2018 WL 3545499, at *2, *13 (E.D.N.Y. July 20, 2018) ("[T]he Government charged Mbacke with the wrong crime," and "because the Government is held to the strict burden of proving each element of the *charged* offense beyond a reasonable doubt, when there is no evidence on one of those elements, the Court has no choice but to enter a judgment of acquittal." (emphasis in original)). This premise holds true for legal questions that are matters of first impression where "the conduct charged is,

quite simply, not a crime." *United States v. Percoco*, 317 F. Supp. 3d 822, 838 (S.D.N.Y. 2018) (entering judgment of acquittal on extortion charge pursuant to Rule 29).

**B. Rule 33**

Pursuant to Rule 33, "[u]pon a defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The question under Rule 33 is "whether letting a guilty verdict stand would be a manifest injustice"—whether the court harbors "a real concern that an innocent person may have been convicted." *United States v. Ferguson* 246 F.3d 129, 134 (2d Cir. 2001) (affirming trial court's grant of a new trial). "The rule by its terms gives the trial court broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *Id.* at 133 (ellipses in original, internal quotation omitted); *United States v. Galanis*, No. 16 Cr. 371 (RA), 2018 WL 5999637, at *11 (S.D.N.Y. Nov. 15, 2018) (granting defendant's Rule 33 motion).

Various facets of a jury trial, considered separately or taken together, may animate a trial court's decision to grant a motion for a new trial. *See United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 96 (2d Cir. 2014) ("considering the record as a whole, we are compelled to conclude a new trial is warranted"). For example, in connection with a claim of prosecutorial misconduct, a prosecutor's "inappropriate remarks" warrant a new trial "if the misconduct caused substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted); *see also Floyd v. Meachum*, 907 F.2d 347, 348 (2d Cir. 1990) ("improper comments in a prosecutor's summation were so numerous and, in combination, so prejudicial that a new trial is required"). Insufficient evidence can also support granting a new trial, such as where a trial court "harbors substantial concern . . . that [one of the defendants] lacked the requisite intent and is thus innocent of the crimes charged

in [the] indictment." *Galanis*, 2018 WL 5999637, at *1. Jury instructions are also taken into account, to determine whether the defendant "was prejudiced by a charge that misstated the law." *United States v. Ferguson*, 676 F.3d 260, 275 (2d Cir. 2011).

**C. Wire Fraud**

The federal wire fraud statute prohibits the use of the wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. The elements of wire fraud are "'(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme.'" *United States v. Finazzo*, 850 F.3d 94, 105 n.12 (2d Cir. 2017) (quoting *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015)); *see also Pasquantino v. United States*, 544 U.S. 349, 355 (2005) (the existence of a scheme to defraud is an essential element of wire fraud). Proof of the first element requires: "[i] the existence of a scheme to defraud, [ii] specific intent to defraud on the part of the defendant, and [iii] material misrepresentations" or omissions in breach of a duty to disclose. *United States v. Handakas*, 286 F.3d 92, 100 (2d Cir. 2002), *overruled in part on other grounds by United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc); *see also United States v. Altman*, 48 F.3d 96, 102 (2d Cir. 1995) ("[T]he concealment by a fiduciary of material information which he is under a duty to disclose to another under circumstances where the nondisclosure could or does result in harm to the other is a violation of the [mail fraud] statute.") (quoting *United States v. Bronston*, 658 F.2d 920, 926 (2d Cir. 1981)).

To prove a wire fraud conspiracy, the government must show that the defendant agreed with another to commit the offense and that he knowingly engaged in the conspiracy with the specific intent to commit the charged wire fraud. *See, e.g.*, *Valle*, 807 F.3d at 516; *United States*

*v. Huff*, No. 12 Cr. 750 (NRB), 2015 WL 463770, at *2 (S.D.N.Y. Feb. 4, 2015) (no overt act requirement for conspiracy charged under 18 U.S.C. § 1349); *United States v. Ali*, 561 F. Supp. 2d 265, 268-69 (E.D.N.Y. 2008) ("What is vital to the crime [of conspiracy] is the underlying criminal objective. . . . Where the act contemplated is not criminal, nothing criminal has crystallized, and any perceived threat to social order [posed by the alleged conspiracy] dissipates.").

## ARGUMENT

### I. THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29

#### A. The Trial Evidence Was Insufficient to Prove that Mr. Middendorf Willfully Violated the Wire Fraud Statute as Charged in Counts Two Through Five

The Court instructed the jury that in order to convict Mr. Middendorf of wire fraud, the government must prove beyond a reasonable doubt that Mr. Middendorf "knowingly and willfully participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with *specific intent to defraud*." Tr. 3445:9-11 (3/8/19) (emphasis added). The Court defined "willfully" as meaning "to act voluntarily and *with a wrongful purpose*." Tr. 3450:1-2 (3/8/19) (emphasis added).[3] And the Court defined "intent to defraud" as meaning "to act knowingly and with the specific intent to deceive for the purpose of causing some financial or property loss to another." Tr. 3450:2-4 (3/8/19). In addition, the Court instructed the jury that "[g]ood faith is a complete and absolute defense to each of the charges in this case," and that if Mr. Middendorf "believed in good faith that he was acting properly, even if he was mistaken in that belief . . . there is no crime." Tr. 3470:21-22, 23-25 (3/8/19).

[3] As argued below in Part II.C.3, the Court's intent instruction, including its definition of "willfully," was insufficient to convey the requisite level of intent under the wire fraud statute and therefore was improper.

The government's evidence did not establish beyond a reasonable doubt that Mr. Middendorf entered into an agreement with anyone else to commit wire fraud (Count Two). *See United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004) ("The agreement between the party charged and his co-conspirators is the gist of the crime of conspiracy.") (citation omitted). The wire fraud conspiracy charged in the Indictment depended on an agreement to obtain confidential PCAOB information in breach of a duty of current or former PCAOB employees. *See* Indictment ¶¶ 94-95, 97, 99, 101. The evidence at trial did not establish that Mr. Middendorf ever agreed with anyone to obtain confidential PCAOB information. Even viewing the record in the light most favorable to the government, Sweet embezzled PCAOB information before he began working at KPMG in 2015, and Sweet's testimony about the "pressure" he felt to provide PCAOB information in order to keep his job at KPMG does not support a reasonable inference that he and Mr. Middendorf *agreed* that a PCAOB employee would obtain confidential PCAOB information in breach of a duty in 2016 and in 2017. Nor does Whittle's testimony about "implicitly" asking Sweet for PCAOB information, *see, e.g.*, Tr. 1878-79 (3/8/19), provide a sufficient basis for a reasonable jury to conclude that the government proved the existence of the charged conspiracy beyond a reasonable doubt. This is particularly so in light of the uncontroverted evidence at trial of Sweet's decision to steal PCAOB information before his departure without any encouragement from anyone at KPMG, *see*, *e.g.*, Tr. 1128:19-1129:13 (2/20/19), and Sweet's repeated habit while at KPMG of forwarding what he acknowledged to be unsolicited information to his KPMG colleagues, *see*, *e.g.*, Tr. 1420:17-1421:2, 1424:14-1425:10, 1426:6-15 (2/28/19).

When the evidence "viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Cassese*, 428 F.3d at 99; *see also Valle*, 807 F.3d at 515; *United States v. Nusraty*, 867 F.2d 759, 765 (2d Cir. 1989). Here, as in *Cassese*, the evidence that Mr. Middendorf entered into a conspiratorial agreement with others is, at most, "characterized by modest evidentiary showings, equivocal or attenuated evidence of guilt or a combination of the three." *Cassese*, 428 F.3d at 103. The proof is insufficient to establish beyond a reasonable doubt that Mr. Middendorf entered into a conspiracy to break the law.

In addition, the government did not meet its burden of proving that Mr. Middendorf acted with the requisite criminal intent (Counts Two through Five). First, the government failed to prove that any other member of the so-called conspiracy agreed to violate the law. As the Court instructed the jury, "[a] conspiracy is a kind of criminal partnership" or "agreement of two or more persons to join together to accomplish some *unlawful* purpose." Tr. 3455:16-18 (3/8/19) (emphasis added). Thus, the government was required to prove beyond a reasonable doubt that "there was a mutual understanding" between the co-conspirators "to cooperate with each other to accomplish an unlawful act." Tr. 3457:6-9 (3/8/19). The government relied upon the testimony of the two cooperating witnesses, Sweet and Whittle, to establish the existence of the charged conspiracy. But both Sweet and Whittle acknowledged that they did not believe they were committing a crime at the time of their conduct. *See*, *e.g.*, Tr. 1107:13-18 (2/2/19) (Sweet); 1881:20-24, 1940:9-11, 1978:10-12 (2/26/19) (Whittle).

Second, Mr. Middendorf testified that he did not believe his conduct was wrong and that he undertook his actions in good faith. Tr. 2864:24-2865:2 (Q: "Did you ever think or believe ou

were committing a crime?" A: "No."); 2865:9-13 ("I don't believe what I did was wrong. . . . [I]n hindsight . . . we had confidential PCAOB information that we used and should not have done that. I was focused on what you could do as an auditor and following the standards did not seem to be wrong."); 2846:11-16 (Q: "Do you think you cheated?" A: "No . . . If you complied with audit standard 3 and only were taking credit for work that was already done, that wasn't cheating.") (3/5/19).[4] In fact, Mr. Middendorf's uncontroverted testimony about his own conduct demonstrates that, in contrast to some of his KPMG colleagues, he did not have any contemporaneous understanding that receiving PCAOB information from Sweet was even problematic, let alone potentially criminal.

In 2016 and 2017, when Mr. Middendorf learned that Brian Sweet had information about the PCAOB's anticipated list of inspections, Mr. Middendorf shared that information with his boss, Scott Marcello. Tr. 2686:25-2687:14 (3/4/19). In February of 2017, Mr. Middendorf also told George Herrmann, KPMG's Chief Auditor, about the information he had received from Sweet. Tr. 2688:16-21 (3/4/19). When Herrmann appeared to be "very upset" by the fact that KPMG had the information, Mr. Middendorf relayed Herrmann's reaction to Marcello, as he considered it a useful "data point" in terms of Marcello's deciding what to do. Tr. 2689 (3/4/19). When Mr. Middendorf was confronted by Laurie Mullen about Sweet's conversation with Diana Kunz, she also appeared to be "very upset and animated that Brian Sweet had gotten this information." Tr. 2691:23-24 (3/4/19). Mr. Middendorf, by contrast, testified that he was "very upset" to learn "*that Mr. Sweet had acted on the information*" because Mr. Middendorf "thought

[4] Similarly, while Mr. Middendorf acknowledged on cross-examination that he understood he "shouldn't have" the complete PCAOB inspection list because it was confidential PCAOB information, Tr. 2887:7-12 (3/5/19), and that he never affirmatively told the PCAOB that KPMG was in receipt of inspection-related information, Tr. 2917:22-15 (3/5/19), he did not testify that he believed that his own conduct was "wrong" or constituted a crime.

[he] was clear on the call on [February] 6th to not do anything with the information." Tr. 2692:9-12 (3/4/19) (emphasis added). In February 2017, when Mr. Middendorf was asked by Mark Rubino, KPMG's Associate General Counsel, to relay what he knew about the receipt of information from Sweet, Mr. Middendorf volunteered information about the 2016 list and re-reviews, in addition to discussing (and forwarding to Rubino his copy of) the 2017 list. *See* Tr. 2697-99 (3/4/19). In short, Mr. Middendorf's conduct is indicative of his belief that he had not done anything wrong in relation to his receipt and/or use of PCAOB information.[5]

In sum, no rational juror could find beyond a reasonable doubt that Mr. Middendorf knowingly and willfully violated the federal wire fraud statute, or agreed with others to do so. Accordingly, Mr. Middendorf should be acquitted of Counts Two, Three, Four, and Five of the Indictment.

### B. The Government Did Not Prove that Mr. Middendorf Aided and Abetted Any PCAOB Employees' Acts of Embezzlement, and Mr. Middendorf Should Be Acquitted of Counts Three, Four, and Five

Mr. Middendorf could not have embezzled property from the PCAOB, because he never possessed PCAOB information as to which he owed a duty of confidentiality to the PCAOB. Tr. 1771-72 (2/25/19) (Hannigan testimony that PCAOB Standing Advisory Group, of which Mr. Middendorf was a member, never received nonpublic PCAOB information covered by EC9). In addition, no reasonable jury could find that the government proved beyond a reasonable doubt that Mr. Middendorf knew or agreed in advance that a PCAOB employee would disclose

[5] As additional evidence of Mr. Middendorf's good faith belief that there was nothing wrong with receiving nonpublic information from the PCAOB that afforded KPMG additional time to prepare, the defense presented the testimony of Jay Hanson, a former PCAOB Board member, who corroborated Mr. Middendorf's own account of meetings at which Mr. Middendorf and his boss—either Jim Liddy or Scott Marcello, depending on the timeframe—were provided information by Hanson and (typically) one of his fellow PCAOB board members about the topics to be covered at the PCAOB Board meetings attended by KPMG, after which Mr. Middendorf shared that information with senior KPMG leadership. Tr. 2528-2530, 2802 (3/4/19).

PCAOB information in breach of his or her duty of confidentiality to the PCAOB (Counts Three, Four, and Five). Accordingly, no reasonable jury could find that Mr. Middendorf aided and abetted any PCAOB employees' embezzlement of PCAOB information in breach of a duty of confidentiality. *See Rosemond v. United States*, 572 U.S. 65, 78 (2014) (for aiding-and-abetting liability under 18 U.S.C. § 924(c) for use of a gun in furtherance of a drug crime, the defendant must have "advance knowledge" that his accomplice would be carrying a gun); *United States v. Reifler*, 446 F.3d 65, 96-97 (2d Cir. 2006) ("A defendant may not properly be convicted of aiding and abetting a crime that was completed before his accessorial acts were performed."); *United States v. Freeman*, 498 F.2d 569, 575 (2d Cir. 1974) (same); *United States v. Docherty*, 468 F.2d 989, 993-94 (2d Cir. 1974) (reversing defendant's conviction for aiding and abetting friend and bank officer's violation of statute prohibiting embezzlement from bank because there was insufficient evidence to demonstrate defendant's knowledge of bank officer's "willful misapplication" of bank funds).

The evidence at trial, viewed in the light most favorable to the government, showed that Sweet misappropriated the 2015 inspection list while at the PCAOB and without any encouragement or knowledge by anyone at KPMG, including Mr. Middendorf. Sweet himself testified that "it was entirely [his] decision" to download PCAOB information and documents before leaving his job there; the decision was "not prompted by any pressure, suggestion or insinuation of any kind from anybody at KPMG that [he] would be expected to bring that information with [him]." Tr. 1128:22-1129:13 (2/20/19); *see also* Tr. 1383:1-16 (2/21/19); Tr. 718:17-18, 719:19-22 (2/19/19). In addition, Sweet made clear that during the KPMG recruitment process, application process, and interviews it was not "suggest[ed] to [him] in any manner whatsoever that [he] should or it would be expected of [him] to download confidential

PCAOB information and take it . . . to KPMG." Tr. 1128:5-21 (2/20/19). When asked why he took the PCAOB information with him to KPMG, Sweet explained that he did it "so that [he] would have this information available to help . . . in this new role as a partner at KPMG." Tr. 720:24-721:1 (2/19/19). Indeed, Sweet's prior behavior corroborates this testimony: he stole information from PwC when he left his employment there, the same way he stole information from the PCAOB when he left its employ. Tr. 1130:1-9 (2/20/19).

The evidence also showed that at the time Sweet began working at KPMG, Sweet's new colleagues were unaware that he had taken the 2015 inspection list and related materials. At Sweet's welcome lunches during his first several days at KPMG, "no one . . . knew that [he] had downloaded the GNF planning profile for 2015," and "no one at that lunch knew that [he] had taken a hardcopy document of the 2015 list of inspections." Tr. 1384:4-10 (2/21/19). Whittle "knew nothing about any materials [Sweet] took with him from PCAOB," before Sweet told him so during an "encounter in [Sweet's] office," Tr. 1974:1-4 (2/26/19); *see also* Tr. 1973:22-25 (2/26/19) (Whittle "had no knowledge of Mr. Sweet bringing confidential PCAOB information with him from the PCAOB over to KPMG . . . prior to [Sweet] offering the list."). There was no evidence presented at trial that could support an inference by a reasonable juror that Mr. Middendorf—or anyone at KPMG—had advance knowledge of, or assisted with, Sweet's embezzlement of the 2015 list.

Similarly, no reasonable jury could find that Mr. Middendorf was involved or assisted in the misappropriation of the 2016 list. Sweet testified that "Wada gave that information to Cindy Holder and she, in turn, gave it directly to [Sweet]." Tr. 701:6-7 (2/19/19). He also stated that Wada "had gone into the PCAOB's IIS system and had accessed the planning information for the PCAOB's KPMG inspection team." Tr. 856:21-23 (2/19/19). After Sweet received the

information, he shared it with Whittle, who was "going to fill Dave Middendorf in," *on what had already been received*. 864:21-24 (2/19/19). Taken in the light most favorable to the government, the evidence at trial demonstrated that the first time Mr. Middendorf had any knowledge of KPMG's receipt of the 2016 list was when Whittle told him about the information Sweet had received, after the embezzlement was complete.

With respect to the 2017 lists, as Sweet explained at trial, Wada "gave [the 2017 preliminary and final lists] to Cindy Holder and Cindy Holder gave it directly to me." Tr. 702:19-20 (2/19/19). Wada "had gone in and accessed, in the PCAOB's IIS system, the current version of what would have been the 2017 GNF planning profile where the planning work was being done and documented by the KPMG planning team, and had gone in and looked at which ones were being recommended for inspection." Tr. 962:4-8 (2/20/19). As in 2015 and 2016, Mr. Middendorf did not learn of the PCAOB information until after the misappropriation had taken place – that is, after Sweet had given the information to Whittle, who in turn advised Mr. Middendorf. *See, e.g.*, Tr. 1476:3-11 (2/22/19) (Mr. Middendorf was not on the call when Sweet first told Whittle about the 2017 list).

Both Mr. Middendorf and Whittle testified to being surprised about the receipt of the 2017 final list, indicating that neither of them had advance knowledge that a PCAOB employee was going to misappropriate the list and share it with KPMG. Specifically, Whittle testified that, on February 3, 2017, when Sweet "told me that he had just received the final board approved list of 2017 PCAOB inspections . . . I was shocked," Tr. 1926:21-24 (2/26/19). He continued, "[t]his was information we had never gotten before. It was a complete list . . . it was just shocking that he would be able to have obtained that information." Tr. 1927:1-5 (2/26/19). Mr. Middendorf did not know how "Mr. Sweet . . . had obtained that information," so he asked, and Sweet

"responded that he – it came to him anonymously and he was not seeking it out." Tr. 2683:1-4 (3/4/19). Afterwards, "Mr. Whittle called [Mr. Middendorf] back . . . and we had a short discussion about, wow . . . I wonder where Brian is getting this information." Tr. 2685:13-18 (3/4/19).

Although Whittle testified that he had "implicitly asked" for the information "through the course of continuously asking [Sweet] to get whatever information he could get from his interactions with the PCAOB staff members," Tr. 1879:3-6, 1919:12-24 (2/26/19), Whittle confirmed that he "never shared with Mr. Middendorf [Whittle's own] understanding that [he was] implicitly asking Mr. Sweet to do certain things." Tr. 1996:7-11 (2/27/19) ("I don't believe we had a conversation about implicit requests."). Moreover, on cross-examination, Sweet admitted to having deliberately misinformed Mr. Middendorf about requests Sweet had made of Holder for PCAOB information:

> DEFENSE COUNSEL: You never told Mr. Middendorf that you solicited that information through Cindy Holder, did you?
>
> SWEET: No.
>
> DEFENSE COUNSEL: In fact, you told him the opposite, you told him you didn't solicit the information, you didn't know why it was being provided to you, right?
>
> SWEET: I did say that, yes.
>
> DEFENSE COUNSEL: It wasn't true?
>
> SWEET: It wasn't true.

Tr. 1477:7-15 (2/22/19). On this record, no reasonable juror could conclude beyond a reasonable doubt that Mr. Middendorf solicited, or had advance knowledge of, the embezzlement of PCAOB information by a PCAOB employee in breach of that employee's duty of confidentiality. The evidence at trial, taken in the light most favorable to the government, demonstrated that Mr. Middendorf only learned of the embezzlement of PCAOB information

after the information had been taken from the PCAOB and shared with others at KPMG. Accordingly, no reasonable juror would have a basis to conclude that Mr. Middendorf in any way aided or abetted the embezzlement of PCAOB information, and Mr. Middendorf should be acquitted of Counts Three, Four, and Five of the Indictment.

### C. The Government's Proof Failed to Establish that the PCAOB Information at Issue is "Property"

#### 1. The PCAOB's information is not "property" because it is regulatory in character.

The trial record does not support a conclusion that the PCAOB information at issue was anything other than regulatory in nature. Accordingly, as the defendants argued in support of their motion to dismiss the Indictment, the PCAOB's information is an intangible regulatory interest, not "property" within the meaning of the wire fraud statute. Dkt. No. 57 at 26-42.

The evidence introduced at trial only confirms the regulatory character of the PCAOB's information: the PCAOB's interest in maintaining the confidentiality of its inspection targets flows directly from its role as the primary regulator of public accounting firms. Stephanie Rodriguez, the head of the PCAOB's U.S. inspection team for KPMG, testified that the principal way in which the PCAOB oversees the four largest accounting firms, including KPMG, is through its inspections program. Tr. 398:25-399:2 (2/13/19). As part of the inspections program, Rodriguez described the process by which the PCAOB identifies the audits it plans to inspect in any given year and compiles those into a list – the "selection process," Tr. 604:8 (2/14/19) – and testified that the PCAOB did not typically disclose its list of anticipated inspections to the audit firms until a date relatively close in time to the inspections for a specific *regulatory* purpose, *i.e.*, to prevent people from "modifying the workpapers . . . just because [an audit] is going to be inspected." Tr. 460:23-461:12 (2/14/19); *see also* Tr. 133:9-10 (2/12/19) (Bricker: "not having advance notice" of inspection targets was part of the "design" of the

PCAOB inspection process). In sum, Rodriguez testified that the PCAOB's interest in keeping its list of inspection targets confidential is integral to and inseparable from the PCAOB's regulatory inspection process.

The evidence at trial also confirmed that the list of upcoming PCAOB inspections has no value to the PCAOB beyond its regulatory value as part of the inspections process. The only reason any witness gave for generating a list of inspection targets was for use in the PCAOB's inspection process. *E.g.* Tr. 440:6-12 (2/14/19). The information serves no other function. The PCAOB does not sell its information, nor does it maintain the confidentiality of its information to satisfy the demands of customers. And just because the PCAOB spends money on the process of choosing which audits to inspect does not make the information that is the output of a regulatory process "property." *See United States v. Schwartz*, 924 F.2d 410, 417-18 (2d Cir. 1991) (rejecting as "patently absurd" the notion that resources expended transform an intangible regulatory interest into a "property" interest); *Cleveland*, 531 U.S. at 21-22 (rejecting argument that processing fees received for licensing applications made poker licenses property).

**2. The PCAOB's information is not "property" because it is not treated confidentially.**

The proof at trial, taken as a whole, failed to establish that the PCAOB treated the identity of its inspection targets as confidential and, therefore, no reasonable jury could find that information to be property within the meaning of the wire fraud statute.

As the Court instructed the jury, "the definition of 'property' for purposes of the wire fraud statute includes an organization's or an entit[y]'s confidential information that is of value to that organization or entity." Tr. 3446:17-20 (3/8/19). "Information is 'confidential'" if it "was both considered and treated by an entity in a way that maintained the entity's exclusive right to the information." Tr. 3446:23-3447:1 (3/8/19). In other words, the jury had to find that

the PCAOB "both consider[ed] the information to be confidential and [took] affirmative steps to treat the information as confidential and maintain exclusivity." Tr. 3447:2-4 (3/8/19). Because the record shows that the PCAOB did not take affirmative steps to treat the identity of its inspection targets as confidential and maintain exclusivity, no reasonable jury could find that information to be property.

The proof at trial established that the purported scope of the PCAOB's sole written confidentiality provision, EC9, is undermined by the actual practices of the PCAOB and its employees. On its face, EC9 appears to be a blanket rule: "Unless authorized by the Board, no Board member or staff shall disseminate or otherwise disclose any information obtained in the course and scope of his or her employment, and which has not been released, announced, or otherwise made available publicly." GX 20 at 9. But the testimony of Barbara Hannigan, the PCAOB's Ethics Officer, made clear that this rule is frequently honored in the breach. For example, she testified that "[t]here is a Board resolution that is essentially a blanket authorization for Board members, division directors, and I believe certain [other] designated people to disclose different types of information." Tr. 1701: 22-25 (2/25/19); DX 1647, 1657. In other words, if you are a "designated" person, information that would otherwise be considered "confidential" by the PCAOB is not. Ms. Hannigan also testified that, notwithstanding that any nonpublic information would "technically" be within the scope of EC9, the PCAOB ethics office "would apply a rule of reason" to determine that certain kinds of information disclosures "do[] not violate EC9." Tr. 1754:18-20 (2/25/19). She testified that this "rule of reason" decision is made "on a case-by-case basis" by the Ethics Office or lawyers in the general counsel's office, and there "might" be situations where the matter is sent to the Board for approval. Tr. 1755:7-10

(2/25/29). This practice, as described by Ms. Hannigan, contradicts the text of EC9, which only creates an exception where the Board authorizes disclosure.

The trial evidence also confirmed that the PCAOB and its employees had inconsistent practices with respect to keeping information confidential. Jay Hanson, a former PCAOB Board member, testified that he met with Mr. Middendorf and KPMG's Vice Chair of Audit prior to PCAOB Board meetings with KPMG, and that he shared agendas and the Board's areas of emphasis for upcoming Board meetings. 2529:7-12 (3/4/19) (stating that he would "review the agenda with Mr. Middendorf at these preboard meetings" and that there were "instances when the agenda had not yet been released to KPMG at the time of these preboard meetings"); *see also* Tr. 2791-2794 (3/5/19). Indeed, Laurie Mullen's testimony confirmed the confusion over PCAOB confidentiality policies not only within the PCAOB, but within KPMG: when discussing the 2017 inspection information with Marcello, she testified that Marcello said, "[W]hat if the PCAOB wants us to have this information, what if the other firms have this information?" Tr. 1668:11-12 (2/25/19). Given this evidence, a reasonable jury could not conclude beyond a reasonable doubt that the PCAOB maintained exclusivity over its confidential information such that it is "property" within the meaning of the wire fraud statute.

The evidence at trial established that the PCAOB's information is regulatory in character, lacks value, and is not treated confidentially. As a result, that information is not "property" within the wire fraud statute, and no reasonable jury could convict Mr. Middendorf on Counts Two through Five.

## II. THE COURT SHOULD GRANT A NEW TRIAL PURSUANT TO RULE 33

### A. The Government's Conduct Regarding Defense Witness Jay Hanson Resulted in a Manifest Injustice Requiring a New Trial

The government effectively silenced and then grossly mischaracterized the testimony of former PCAOB Board member Jay Hanson, a critical defense witness, through its *ex parte* communication with the Court and improper rebuttal argument.

Prior to the start of trial, the defense anticipated that Hanson would have testified to statements he made to Mr. Middendorf in 2014, 2015 and 2016, and recounted to a defense investigator two weeks before the start of trial, that PCAOB inspections were unfair and that PCAOB inspectors looked for mistakes instead of pursuing the PCAOB's stated goal of improving audit quality. This evidence was at the heart of Mr. Middendorf's defense: Mr. Middendorf could not have intended to harm the PCAOB by acting to counteract certain practices that Hanson – an agent of the PCAOB, a sitting Board member – had told Mr. Middendorf were unfair and needed to be reformed. In short, Mr. Middendorf could not have intended to defraud the PCAOB when he believed his actions were consistent with actions Hanson himself had taken to ameliorate some of the PCAOB's practices in an attempt to prevent PCAOB inspections from devolving into a game of "gotcha."

As described below, it appears to the defense, based on the facts available, that the government went to great lengths to prevent the jury from learning of this evidence. Then, in its rebuttal summation, the government improperly asserted that the lack of evidence from Hanson, whom it misleadingly described as "a completely disinterested third party," demonstrated that Mr. Middendorf had lied during his trial testimony about his conversations with Hanson. [redacted]

[redacted] Furthermore, the fact that the prelude to these circumstances occurred in secret, without the knowledge of Mr. Middendorf or his counsel, in the midst of a *criminal* trial, is beyond troubling.

This conduct caused a manifest injustice to Mr. Middendorf that warrants a new trial.

**1. Relevant Facts**

Jay Hanson was a member of the PCAOB Board from February 2011 through December 2016. Tr. 2512:1-7 (3/4/19). Despite the fact that the PCAOB was the alleged victim of the charged wire fraud, Hanson was the only PCAOB Board member to testify at trial.

On January 28, 2019, prior to the trial, an investigator retained by the defense met with and interviewed Hanson. On February 5, 2019, the investigator's report of that interview was produced to the government as Rule 26.2 material and marked as Exhibit JH1, and is attached hereto as Exhibit A. As indicated in the report, Hanson spoke expansively about the conversations he had with Mr. Middendorf, while Hanson was a PCAOB Board member, and about the unfairness of PCAOB inspections. For example, Hanson stated, with respect to the actions of inspectors at the PCAOB and the PCAOB's stated goal of improving audit quality, "that the PCAOB's mission was to improve audit quality, but that the 'DNA' of senior leadership was 'let's go do some Gotcha.'" Ex. A at 1. Hanson explained to the defense investigator that, not only had he conveyed to Mr. Middendorf his view that certain PCAOB personnel were engaging in unfair practices and had strayed far from its mission, but Hanson also described private, pre-Board meetings he had with Mr. Middendorf during which he shared nonpublic, confidential PCAOB information with Mr. Middendorf about the agenda and/or topics to be discussed at the Board meetings in an effort to rectify these failings.

On February 26, the government wrote a letter to the Court to preclude certain portions of Hanson's testimony, including "stories he heard or incidents that were recounted to him" regarding inspectors going into an inspection assuming they will find deficiencies, "overzealous" inspectors, and particularly tough inspections teams. Letter from government to Hon. J. Paul Oetken (Feb. 26, 2019), 2. The following day, February 27, after hearing our oral objection to the government's letter, Tr. 2107:11-2108:12 (2/27/19), the Court indicated that any particular objections regarding Hanson's testimony could be taken up at a later time. Tr. 2108:6-7 (2/27/19).

Hanson's direct examination, on March 4, was vastly different in tone and particulars from his January 28 interview. *See* Tr. 2509-51 (3/4/19). Far from being expansive on the topic of his pre-Board meetings with Mr. Middendorf and his conversations with Mr. Middendorf about PCAOB inspectors, Hanson was reserved and his testimony was limited in scope.[6] He denied that he had informed Mr. Middendorf, during their pre-Board meetings, that PCAOB inspectors played a game of "gotcha." When the defense tried to refresh Hanson's recollection on this topic with its investigator's report, the government requested a sidebar. At sidebar, the Court indicated that it viewed Hanson's statement to Mr. Middendorf as potentially "relevant to state of mind in terms of the overall background," because "[i]t is a communication from a PCAOB board member, which I think is significant." Tr. 2549:11-13 (3/4/19). [redacted]

[6] *See* Tr. 2543:12-14 (3/4/19) (Q. "Could you describe discussions that you had with Mr. Middendorf about PCAOB inspectors?" A. "I don't remember specific discussions. . . .").

[redacted] We then attempted to refresh Hanson's recollection "about any statements [he] made to Mr. Middendorf during these pre-board meetings about improving audit quality and the actions of the inspectors at the PCAOB," with the investigator's report, to which Hanson responded, "I don't recall specific discussions like that with Mr. Middendorf" or any general discussions. Tr. 2551:3-10 (3/4/19). With that, Hanson's direct examination concluded. On re-direct examination, Hanson acknowledged that he (and presumably his counsel) met with a government prosecutor, "with respect to [his] testimony, before [March 4]." Tr. 2569:11-13 (3/4/19).[7]

At the beginning of the proceedings on March 7, we requested that the government produce the *ex parte* submissions. Tr. 3106:5-8 (3/7/19). [redacted]

---

[7] We understand that Hanson and his counsel met with the government on Friday, March 1.

[8] The government also represented that it did not "possess" Hanson's counsel's *ex parte* filing. Tr. 3107:12-13 (3/7/19).

[redacted]

During the defense summation on March 7, we argued as follows:

> Mr. Hanson, and here's why he's critical. A PCAOB board member told Dave that PCAOB inspections are unfair. He used the expression "Gotcha." And he said that the inspections team would pick firms to have a turn in their box, take turns who they would focus on.
>
> * * *
>
> This is critical because it explains Mr. Middendorf's understanding of the PCAOB. He authorizes the rereviews because, following AS 3, it would make the workpapers clearer, so KPMG would get the credit or comment it deserves.
>
> And the government says he's rehearsed that answer. Nonsense. He has three private meetings and one private telephone call with two PCAOB board members, with his boss, during which the board members tell them that the inspections are unfair, are a game of gotcha. And that's why Dave, in March of 2016, approved the rereview, to be as well prepared as possible without changing any audit work, so the inspections would be fair.

Tr. 3231:1-21 (3/7/19). During its rebuttal summation the next day, the government mischaracterized this argument as being akin to a request for nullification and claimed that the defense had misstated Hanson's testimony:

> First of all, that is not what Jay Hanson said. Jay Hanson said, I don't remember any conversation like that. Mr. Middendorf claims that conversation happened. <u>Ask yourselves who you believe: a completely disinterested third party called by the defense or a defendant who is on trial and is trying to justify his actions</u>.
>
> * * *
>
> Think about what defense counsel is saying here. David Middendorf thought it was okay to cheat because the system was unfair. That is a shocking argument. If your child came home from school and you got a call from the teacher they had been caught cheating on a test, and your child's response was, yeah, but the test was really unfair, it was too hard, would you say, oh, well, that makes it okay then? Of course not. You can't cheat if the test is too hard. The rules still apply to you.

Tr. 3394:9-3395:2 (3/7/19) (emphasis added).

On March 10, 2019, we wrote to the Court and requested a mistrial by reason of the government's rebuttal summation, and reiterated our request that the Court "order the government to produce forthwith to all defense counsel the government's and counsel for Mr. Hanson's *ex parte* submissions to the Court." Specifically, we argued as follows:

> The defense should be permitted to review the *ex parte* submissions to (i) determine if any improper pressure was put on Mr. Hanson by the government that influenced his testimony, and about which we should have been able to cross-examine him, and to (ii) determine whether the government's rebuttal argument that Mr. Hanson—whose testimony was critical to Mr. Middendorf's defense—was "completely disinterested" was inaccurate or otherwise improper, and as a result whether appropriate relief should be afforded Mr. Middendorf (*e.g.*, a curative instruction to the jury, or potentially, depending on the content of the *ex parte* submissions, some other relief).

Letter from N. Boxer to Hon. J. Paul Oetken (Mar. 10, 2019), 8-9. On March 11, the Court heard argument on our March 10 submission, Tr. 3487:16-3498:1 (3/11/19), [redacted] The government also again argued that "Mr. Hanson's lawyer ought to have a chance to be heard before anything is unsealed, either the government's letter or [Mr. Hanson's] letter." Tr. 3492:2-4 (3/11/19) The Court denied the motion for a mistrial, and stated, "With respect to the *ex parte* letter about Jay Hanson, I'm considering the idea – I do think it is fair for you to see it, now that the reason for its being filed *ex parte* no longer exists, which is revealing [cross-examination] strategy." Tr. 3498:5-8 (3/11/19). Later that day, the jury rendered its verdict.

On March 12, 2019, we wrote to the Court again to request production of the *ex parte* submissions. On March 20, 2019, the Court issued an Order requiring the government and Hanson's counsel to show cause why the *ex parte* letters should not be produced to defense counsel, "provided that the letters are subject to a protective order and treated as confidential."

On April 3, 2019, Court issued an Order concluding that "there is no basis for requiring Mr. Hanson's counsel to produce his *ex parte* letter *dated March 1, 2019*, because this letter was never seen by the Government," but directing the government to produce its *ex parte* letter dated March 3, 2019 (emphasis added). By email on April 4, Hanson's counsel wrote to counsel for the government, Mr. Middendorf and Mr. Wada, as follows:

> On behalf of Jay Hanson, we submitted this afternoon an *ex parte* letter with the Court objecting to the portion of Judge Oetken's order that required the government to disclose its *ex parte* letter dated March 3, 2019. We also want to inform you that the government has agreed with our request not to produce its ex parte letter until the Court has ruled on our objection. Thank you very much.

We objected to the "agreement" between Hanson's counsel and the government to not abide by the Court's Order by reply email to the parties.[9]

On April 8, 2019, the Court issued an Order declining to reconsider its decision, and by email on April 8, the government produced its March 3 *ex parte* letter. [redacted]

---

[redacted] In fact the government did not produce the March 3 letter until after the Court's April 8 Order.

### 2. The Court Should Hold an Evidentiary Hearing to Explore the Reason for the Contrast Between Hanson's Testimony and His Prior Statements.

One fact is clear: between January 28, 2019, and March 4, 2019, Hanson's recollection of his meetings and conversations with Mr. Middendorf changed dramatically. Given the present record, the defense is entitled to a hearing to determine the reason why.

[redacted] As set forth above:

| | |
|---|---|
| January 28: | Hanson speaks with defense investigator at his home |
| February 5: | Defense produces investigator's report to the government |
| February 26: | Government letter to the Court, on notice to the defense, moving to preclude portions of Hanson's anticipated direct testimony |
| March 1: | Government meets with Hanson; Hanson's counsel submits *ex parte* letter to the Court |
| March 3: | Government submits *ex parte* letter to the Court |
| March 4: | Hanson testifies in a manner inconsistent with his prior statements |

[redacted] There is no other plausible explanation for why Hanson recalled clearly and vividly on January 28 conversations he had with Mr. Middendorf three or four years earlier but then professed to have no recollection of these conversations just five weeks later, on March 4.

[redacted] Without knowledge of the contents of the government's letter, Hanson's counsel would have no good faith basis for his April 4 request for reconsideration. And if Hanson's counsel was aware of the content of the government's letter, so was Hanson. S*ee, e.g.*, N.Y. Rule of Professional Conduct 1.4(a)(3) ("A lawyer shall keep the client reasonably informed about the status of the matter.").

At a minimum, we are entitled to a thorough evidentiary hearing to explore, under oath, who knew what and when, [redacted] including from each government lawyer and/or investigator present at the meeting that occurred between Hanson and the government prior to his March 4 testimony, from each government lawyer and/or investigator who communicated with Hanson's counsel, and from Hanson and from his counsel. *See United States v. Williams*, 02 Cr. 1372 (ALC), 2017 WL 3613661, at *2 (S.D.N.Y. Aug. 21, 2017) (noting, in considering motion to compel discovery in connection with Rule 33 motion, "most courts . . . seem to acknowledge that, in certain circumstances, some discovery may be appropriate as part of the post-trial factual development").

In addition, each of Hanson's counsel's prior *ex parte* submissions should be made available to the defense. Their relevance is not dependent upon whether the government has or

has not seen them; instead, they are relevant to the extent any statements therein inform on the issue of Hanson's knowledge, or what it is reasonable to conclude was Hanson's knowledge, of the government's potential to cross-examine him on the topics referenced in its March 3 *ex parte* letter.

**3. The Government's *Ex Parte* Submission Denied Mr. Middendorf the Opportunity to Challenge the Grounds for Cross-Examination and Effectively Confront Hanson.**

The fact that the government proceeded *ex parte* severely prejudiced the defense and compounded the resulting constitutional harm. First, [redacted]

[redacted] Instead, we were left with his answer of "I don't recall" after the lengthy sidebar requested by the government, a sidebar which

occurred just as we questioned Hanson about evidence that was central to proof of Mr. Middendorf's lack of criminal intent. As it was, given the government's improper *ex parte* submission, we were left without a basis to establish why Hanson's story changed between the time when he spoke with our investigator and when he took the stand, other than the fact that he met with the government.[10]

The Court cannot let stand the possibility that Mr. Middendorf's constitutional right to a fair trial was so grossly subverted.

**4. The Prosecutor's Remarks in Rebuttal Compounded the Prejudice Suffered by Mr. Middendorf.**

In the government's rebuttal summation, the prosecutor deliberately misled the jury by stating that Hanson was "a completely disinterested third party," Tr. 3394:12 (3/8/19), [redacted] Tr. 2549:25-2550:2 (3/4/19). The prosecutor's request of the jury, to "[a]sk [them]selves who [they] believe: *a completely disinterested third party* called by the defense or a defendant who is

[10] *Ex parte* submissions, let alone such applications made in the midst of a criminal trial, concerning the most critical defense witness, should be permitted only in extraordinary circumstances, typically for emergencies or non-substantive matters. The government's March 3 *ex parte* letter addressed substantive matters and, consequently, should not have been filed *ex parte*. The letter addressed the government's view of the appropriate scope of cross-examination of a witness, a topic that was previously addressed in filings between the parties and in open court, both at the motion *in limine* stage, *see* Defs.' Mem. of Law in Opp. to Gov. Omnibus Mot. in Lim., dated Jan. 7, 2019 [redacted] Letter by Middendorf to the Court dated Feb. 5, 2019 [redacted] Court's Feb. 8, 2019 order [redacted] and during the trial, *see, e.g.*, Tr. 1040:11-1041:22 (cross-examination of Sweet regarding evasion of service). By proceeding *ex parte*, the government obtained an improper opportunity to frame and shape for the Court substantive issues without contemporaneous input from the defense. This is improper, and the government's wish to preserve the confidentiality of its trial strategy is not an excuse. Indeed, litigants in every trial face the recurring dilemma of whether to seek guidance from the Court, *in limine*, and thus reveal trial strategy, or to delay presenting such issues until at trial.

on trial and is trying to justify his actions," Tr. 3394:12-14 (3/8/19) (emphasis added), [redacted] And when defense counsel objected at the end of the rebuttal summation to the prosecutor's remarks regarding Hanson, the Court refused to give a specific instruction characterizing the prosecutor's argument as improper or instructing the jury to disregard it. Tr. 3411:10-18, 3413:12-20 (3/8/19). These events compounded the prejudice of the government's prior conduct regarding Hanson's trial testimony.

***

Jay Hanson was the critical witness for the defense. Two weeks before trial, he recalled four-year-old conversations with Mr. Middendorf that negated Mr. Middendorf's intent to defraud and which corroborated Mr. Middendorf's testimony. That all changed after the government mounted a concerted effort to prevent the jury from hearing this evidence, including an *ex parte* submission [redacted] And, most egregious of all, during its rebuttal summation the government used these "new" facts as a

weapon to argue that Hanson, a "completely disinterested third party," had proven that Middendorf was a liar. The Court should not permit this violation of due process and manifest injustice to stand.

### B. The Prosecutor's Improper Remarks During Rebuttal Summation Created a Manifest Injustice Requiring a New Trial

In addition to the remarks regarding Hanson, the government made other improper statements during rebuttal summation that caused a manifest injustice to Mr. Middendorf and warrant a new trial.

In a rebuttal, the government is permitted "fair comment on the evidence at trial and reasonable inference therefrom" and "fair response to remarks made by defense counsel during summation." *Ogletree v. Graham*, 559 F. Supp. 2d 250, 260 (N.D.N.Y. 2008) (internal quotation marks omitted). Improper statements by prosecutors in principal or rebuttal summation can constitute grounds for a new trial where the statements cause prejudice to the defendant. *See, e.g.*, *Floyd*, 907 F.2d at 355; *United States v. Friedman*, 909 F.2d 705, 709 (2d Cir. 1990); *United States v. Richter*, 826 F.2d 206, 209 (2d Cir. 1987). To determine whether a prosecutor's remarks constitute "substantial prejudice" sufficient to warrant a new trial, courts consider "[1] the severity of the misconduct; [2] the measures adopted to cure the misconduct; [3] and the certainty of conviction absent the improper statements." *Floyd*, 907 F.2d at 355 (quoting *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981)).

The government's misconduct in this case was severe. In rebuttal summation, the prosecutor's remarks (i) impermissibly shifted the burden of proof to the defense by arguing that there was certain evidence that the defendants "have to attack," Tr. 3371:16 (3/8/19), and that it was necessary for Mr. Middendorf to prove that the interior of the specific location of the restaurant Avra, at which Sweet's welcome lunch took place, "look[ed] different" than the

alternative location in the photograph erroneously identified by Sweet on direct examination, Tr. 3374:5 (3/8/19). The government's remarks regarding the restaurant not only misstated the defense argument but erroneously, and presumably knowingly, misstated the appearance of the interior of the 48th Street Avra, introduced evidence not in the trial record and thereby "testified" to the jury in order to vouch for its star witness, and argued that the burden of proof resided with the defense. Tr. 3373:19-3374:7 (3/8/19

The measures adopted by the Court to cure the government's misconduct were insufficient. When the government improperly stated for the first time that the defense "ha[d] to attack" certain evidence because it was "devastating," the Court simply stated that its instructions would "clarify the burden." Tr. 3371:9-10 (3/8/19). When the government repeated its statement that the defense "ha[d] to attack" the evidence, after cursorily reminding the jury that "[d]efense counsel doesn't have any burden," the Court stated, "Same clarification. My instructions will make it clear." Tr. 3371:18-19 (3/8/19). The government then remarked, "Thank you, your Honor," and reiterated the improper argument: "There is no question that they [defense counsel] have to attack this evidence." Tr. 3371:21-22 (3/8/19). Thus, despite two contemporaneous objections and two admonishments by the Court, the prosecutor persisted in stating for a third time that the defendants "ha[d] to attack" evidence, impermissibly shifting the burden of proof to the defense without any countervailing intervention by the Court.

With respect to the restaurant photographs, while the Court "clarif[ied] for the jury that the government has the burden of proof" after defense counsel's contemporaneous objection to the prosecutor's argument, and noted that "any suggestion that the defendants have a burden of presenting evidence to show that they are not guilty . . . is not required," Tr. 3374:11-15 (3/8/19), the Court's admonition did not cure the government's inaccurate bolstering of Sweet with

purported facts not in evidence – the prosecutor's statement regarding the interiors of the two restaurants was erroneous and presumably knowingly erroneous – and at a point in the trial where we did not have an opportunity to rebut through other evidence or argument.

Mr. Middendorf's conviction in this case was by no means assured in the absence of the government's improper remarks. Indeed, Mr. Middendorf was acquitted on Count One, and the evidence related to that count was not discussed in any of the portions of the rebuttal containing improper argument referenced above. It cannot be said that Mr. Middendorf undoubtedly would have been convicted regardless of the prosecutor's improper statements during rebuttal summation.

In sum, the prosecutor's misconduct warrants a new trial for Mr. Middendorf.

**C. Mr. Middendorf Is Entitled to a New Trial Due to Instructional Error**

**1. The Court's Wire Fraud Instruction Was Erroneous.**

The Court's wire fraud instruction failed to inform the jury that Mr. Middendorf could not be convicted if it only concluded that Mr. Middendorf engaged in a scheme to share or use already embezzled PCAOB information and did not have advance knowledge of, let alone participate in or aid and abet, a scheme to embezzle the information it in the first place. The Court provided the jury with no instruction on when a wire fraud scheme by embezzlement is complete, and instructed the jury in a manner that permitted, and perhaps even encouraged, that it convict Mr. Middendorf of wire fraud merely for sharing and using PCAOB information after the embezzlement by others.

The Court instructed the jury that for each of the substantive wire fraud counts (Counts Three, Four, and Five), Mr. Middendorf was charged with "participat[ing] in a scheme to defraud the PCAOB by misappropriating, embezzling, obtaining, *sharing, and using* the PCAOB's

property . . . in breach of duties of confidentiality owed to the PCAOB by former and current PCAOB employees." Tr. 3442-43 (3/8/19) (emphasis added). Mr. Middendorf objected to this instruction both by letter, Dkt. 268 at 7, and at the charge conference, Tr. 3035:4-3037:6, 3054:14-3056:5 (3/6/19), because the mere sharing and using of stolen information does not constitute wire fraud. Accordingly, Mr. Middendorf requested that the jury be instructed that "[a] defendant cannot have participated in the charged scheme to defraud if he merely received or used confidential information after it was already embezzled by someone else." Dkt. 197 at 27.[11] The Court did not include such an instruction in its charge.

Mr. Middendorf's requested instruction is consistent with Second Circuit law. In *United States v. Sampson*, 898 F.3d 270, 277-78 (2d Cir. 2018), the Court stated that "[a]n individual commits embezzlement when he (1) with intent to defraud; (2) converts to his own use; (3) property belonging to another; in a situation where (4) the property initially lawfully came within his possession or control. . . . When all four elements come together, an embezzlement is 'complete.'" *See* Tr. 3035:14-3036:1 (3/6/19) (MS. LESTER: "The use that's associated with embezzlement . . . under Sampson is the intent that the embezzler has to use it. That's when the crime is complete. . . . The separate use by Mr. Middendorf or other people, as alleged, at KPMG is not a crime in and of itself. There is no fraudulent misrepresentation. There is no omission."); *see also United States v. Czubinski*, 106 F.3d 1069, 1074-75 (1st Cir. 1997) (individual charged with wire fraud based on misappropriation of confidential information must intend to deprive the owner of its property "through either disclosure or [his intended] use of that information").

[11] Mr. Middendorf first advanced this argument in his motion to dismiss. Dkt. 58 at 1-5.

Over defense counsel's repeated objections, the jury received no instruction that a scheme to embezzle information is complete when the information is misappropriated with the intent to deprive the lawful owner of that information. Instead, the jury was instructed that proof of sharing and using the information taken from the PCAOB would establish participation on a wire fraud. This was erroneous and a manifest injustice to Mr. Middendorf.

The charge also encouraged the jury to convict Mr. Middendorf without regard to his involvement in the origination of the embezzlement scheme. The Court gave the jury three consecutive full paragraphs of instruction – more than a full page of the trial transcript – relating to what the government was ***not*** required to prove with regard to defendants' involvement in the scheme, including that: "it is not necessary for the government to establish that the defendant you are considering originated the scheme to defraud"; "[i]t is also not required that the defendant you are considering participated in or had knowledge of all of the operations of the scheme"; "[i]t also is not necessary that the defendant you are considering participated in the illegal scheme from the beginning"; "[e]ven if the defendant participated in the scheme to a lesser degree than others, he is nevertheless equally guilty so long as that defendant became a member of the scheme with knowledge of its general scope and purpose."[12] Tr. 3448:23-3449:23 (3/8/19). Mr. Middendorf objected to these paragraphs as slanted in tone against the defense, redundant, and cumulative, Dkt. 268 at 10, but the Court overruled the objection and gave this instruction without any countervailing language in this portion of the charge about the

[12] This portion of the charge was taken verbatim from the government's requested charge, over objections by the defense, despite the fact that the government cobbled together the language for its proposed instruction from no fewer than seven different cases, including one concurring opinion, with no attempt to attribute which portions of the charge were supported by which case/s. Dkt. 197 at 27-33. By contrast, Mr. Middendorf's proposed charge, which was largely based on the model Judge Sand instruction, and which noted precisely which authority was relied upon when it deviated from the Sand instruction, was almost entirely rejected by the Court.

degree of knowledge and participation that is required to *join* a scheme to defraud. This instruction was also legally incorrect in stating that "[a] person who comes in[to a scheme] at a later point . . . is legally responsible for all that may have been done in the past." Tr. 3449:10-15 (3/8/19). This charge again incorrectly instructed the jury that a defendant who "shares" or "uses" confidential information after it has already been embezzled without his prior knowledge can join the scheme to defraud and be legally responsible for the embezzlement. As noted above, *Sampson* forecloses such a result.

In sum, the Court's wire fraud instruction encouraged the jury to convict Mr. Middendorf for sharing or using PCAOB information without regard to whether that information had already been embezzled. Such an instruction was legally incorrect and requires that Mr. Middendorf be granted a new trial.

**2. The Court Improperly Omitted a Materiality Instruction.**

The Court's charge, while explaining what constitutes a misrepresentation, did not include any instruction that a misrepresentation (or omission) must be material to be fraudulent under the wire fraud statute. *See Neder v. United States*, 527 U.S. 1, 25 (1999) (holding materiality is an element of wire fraud). Mr. Middendorf's proposed charge, submitted two weeks prior to the start of trial, included the Sand pattern instruction on materiality. Dkt. 197 at 30 (citing 2 Sand, et al., Modern Federal Jury Instructions ¶ 44.01, Instruction 44-5. When the Court's draft instructions did not include any instruction on materiality, Mr. Middendorf objected and again proposed inclusion of the Sand instruction. Dkt. 268 at 4-5 (citing 2 Sand, et al., Modern Federal Jury Instructions ¶ 44.01, Instruction 44-4 ("The false or fraudulent representation (or failure to disclose) must relate to a material fact or matter. A material fact is one that would reasonably be expected to be of concern to a reasonable and prudent person in

relying upon the representation or statement in making a decision. . . . The same principle applies to fraudulent half truths or omissions of material facts.")). Despite the fact that the government did not object to the inclusion of a materiality instruction, Tr. 2997:12-14 (3/5/19), the Court failed to include any instruction with regard to materiality. This omission was erroneous and permitted the jury to convict without holding the government to its burden of proving all of the elements of wire fraud beyond a reasonable doubt.

**3. The Court's Willfulness Instruction Was Improper and Contrary to the Law of this Circuit.**

The Court's charge that "'willfully' means to act voluntarily and with a wrongful purpose," Tr. 3450:1-2 (3/8/19), is inconsistent with the law of the Second Circuit and the precedent of this Court and allowed the jury to convict Mr. Middendorf without having to find that he had an intention to do something the law forbids, a particularly prejudicial error on the facts of this case. The Court's definition of "willfully" was also redundant of the definitions of "knowingly"—which already included the concept of acting voluntarily—and "specific intent to deceive"—which already included the concept of a wrongful purpose (*i.e.*, causing financial or property loss)—and thereby in effect removed the willfulness element from the charge altogether.

As the Second Circuit recently explained in *Sampson* in the context of embezzlement, "[t]o act with the 'intent to defraud' *means to act willfully*, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself." *Sampson*, 898 F.3d at 277 n.5 (emphasis added) (quoting *United States v. Cloud*, 872 F.2d 846, 852 n.6 (9th Cir. 1989)); *see also United States v. Stevens*, 210 F.3d 356, 2000 WL 419938 at *1 (2d Cir. 2000) (summary order) (participating "knowingly . . . willfully [and] with specific intent to defraud" "properly inform[s] the jury of the elements of

mail and wire fraud."). The *Sampson* Court's use of the conjunctive "and" makes clear that willfulness and specific intent to deceive are separate elements of embezzlement. Mr. Middendorf requested that the Court follow Judge Sand's treatise, the standard resource in the Second Circuit, for the requisite intent to commit wire fraud:

> The second element that the government must prove beyond a reasonable doubt is that the defendant participated in the scheme to defraud knowingly, willfully and with specific intent to defraud. . . . "Willfully" means to act knowingly and purposely, with an intent to do something the law forbids; that is to say, with a bad purpose either to disobey or disregard the law. "Intent to defraud" means to act knowingly and with the specific intent to deceive, for the purpose of causing some financial or property loss to another.

2 Sand et al., Modern Federal Jury Instructions ¶ 44.01, Instr. 44-5. As stated in the commentary to this instruction, "It is universally agreed that mail and wire fraud are specific intent crimes and that the jury must be so charged." *Id.* Comment. The Court's definition of "specific intent" should have included sufficiently clear language for the jury to understand that it must find that the defendant acted with an intent to do something that the law forbids in order to find Mr. Middendorf participated in the charged scheme to defraud. *See United States v. Massa*, 740 F.2d 629, 643 n.8 (8th Cir. 1984) ("Specific intent, as the term implies, means more than the general intent to commit the act. To establish specific intent, the Government must prove that the defendant knowingly did an act which the law forbids, purposely intending to violate the law.").[13]

---

[13] As we noted in our letter to the Court dated January 28, 2019 (Dkt. 196), courts in this District have routinely charged that willfulness, as an element of wire fraud, requires an unlawful purpose. *See United States v. Blaszczak*, 17 Cr. 357 (S.D.N.Y.) (Kaplan, J.), Tr. 3946-47, 3970; *United States v. Jones*, 16 Cr. 553 (S.D.N.Y.) (Dkt. 125) (Nathan, J.), Jury Charge at 22; *United States v. Afriyie*, 16 Cr. 377 (S.D.N.Y.) (Dkt. 83) (Engelmayer, J.), Jury Charge at 23, 27-28; *United States v. Tagliaferri*, 13 Cr. 115 (S.D.N.Y.) (Dkt. 89) (Abrams, J.), Tr. 2757, 2786-87 (incorporating wire fraud instruction by reference: "'Willfully' means to act knowingly and purposely, with an intent to do something the law forbids, that is to say, with bad purpose either

Judge Sand's pattern instruction is not a mistake of law defense. As Judge Abrams charged the jury in *Tagliaferri*, an instruction endorsed by defendants, Tr. 3059:1-8 (3/6/19), and consistent with Sand, "The defendant need not have known that he was breaking any particular law or any particular statute. A defendant need only have been aware of the generally unlawful nature of his act." 3 Cr. 115 (S.D.N.Y.) (Dkt. 89) (Abrams, J.), Tr. 2757, 2786-87.[14]

Including an instruction requiring the jury to find that Mr. Middendorf acted with an unlawful purpose was paramount in this case, which did not involve a swindle of money, the "typical" wire fraud scheme to deprive a victim of money or property for personal monetary gain and a situation where it is self-evident that the defendant intended to do something that the law forbids. As defense counsel argued repeatedly to the Court prior to and during trial, the definition of willfulness needed to explain to the jury that more than a "wrongful purpose" was required, because otherwise the jury could convict the defendant for purposefully violating the ethical norms or rules of the accounting profession or of the PCAOB, or for "cheating the system." Indeed, the government again and again elicited testimony that auditors were required to act with integrity and objectivity. *See, e.g.*, Tr. 1630:22-24 (2/25/19) (Marino: "the capital markets rely on auditors to be independent and to be objective and to have the utmost integrity"); Tr. 2437:12-14 (2/28/19) (Q. . . . [F]air to say that the integrity of an auditor is among an auditor's most important characteristics? Blake: Yes.); Tr. 2631:14-18 (3/4/19) (Q. And you

---

to disobey or to disregard the law. The defendant need not have known that he was breaking any particular law or any particular statute. A defendant need only have been aware of the generally unlawful nature of his act.").

[14] During the trial, prior to the charge conference, the Court stated that it was inclined to include a willfulness instruction akin to the instruction given by Judge Abrams, Tr. 2222:20-21 (2/27/19) ("THE COURT: At this point, I think I probably will adopt Judge Abrams' version of willfulness."), but the Court ultimately reverted to a different (and lower) standard after the close of evidence.

agree, don't you, that it's important for the auditing profession to have integrity, right? Atkins: Yes. Q. To be effective? Atkins: Yes.). The government also argued to the jury that the conduct at issue constituted "cheating." *See*, *e.g.*, Tr. 3110:7-10 ("[Middendorf] made a decision, a decision to cheat . . . to corrupt the process that should have been done with truthfulness and integrity."), Tr. 3114:2-3 ("[Defendants] were lying and cheating and stealing for years."), Tr. 3142:9-10 ("It was a scheme to manipulate inspection results, to cheat the regulator."), 3190:1-2 ("The defendants, David Middendorf and Jeffrey Wada, they lied, they schemed, and they cheated.") (3/7/19); Tr. 3395:1-2 (3/8/19) ("You can't cheat if the test is too hard. The rules still apply to you.").

Given the government's repeated references to both auditor integrity and the concept of cheating, coupled with the Court's willfulness charge, there was a real risk that the jury confused proof of a violation of an ethical duty or a common sense notion of "wrongdoing" with proof of intent to commit the crime of wire fraud. Defining specific intent to defraud, as Sand does—and, as the Defendants proposed in their requests to charge—to require that the defendant must have acted "willfully, with an intent to do something that law forbids," would have prevented misleading the jury as to the correct legal standard and avoided the risk of the jury convicting Mr. Middendorf based upon conduct that does not require a specific intent to defraud. Without such an instruction, the Court's charge resulted in a manifest injustice and warrants a new trial.

**4. The Court Should Have Instructed the Jury on Multiple Conspiracies.**

The evidence at trial supported the reasonable inference that more than one conspiracy existed during the course of conduct at issue, primarily because the source of the PCAOB information was completely disconnected from the end users of the information and knew nothing about them or the way in which they would ultimately use the confidential information,

if at all. Accordingly, the Court should have instructed on multiple conspiracies and left it to the jury to decide whether the government had proven the single, charged conspiracy or whether the evidence supported the existence of multiple conspiracies.

"A conviction cannot stand if the government has alleged a single conspiracy, but its proof demonstrates multiple conspiracies." *United States v. Alkins*, 925 F.2d 541, 553 (2d Cir. 1991) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)). "[I]n order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001) (citation and internal quotation marks omitted). "'[W]here the proof is susceptible to the inference that there was more than one conspiracy, the question of whether one or more than one conspiracy has been established is a question of fact for a properly instructed jury.'" *Alkins*, 925 F.2d at 553-54 (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990)). Defendants proposed the inclusion of a multiple conspiracies charge and objected to the omission of such an instruction in the Court's draft jury charge, Tr. 2486:9-2490:25 (2/28/19), Dkt. 268 at 15, but the Court overruled the objection, Tr. 3105:20-21 (3/7/19) ("I thought about [a multiple conspiracies instruction] and concluded that it was not necessary or appropriate.").

The evidence at trial, viewed in the light most favorable to the government, did not establish that Wada, the alleged source of the PCAOB information, had any knowledge of the information being passed to Mr. Middendorf. There was no evidence that Wada even knew who Mr. Middendorf was, and there was no evidence that Mr. Middendorf knew who Wada was prior to being indicted. Tr. 2959:21-2960:2 (3/5/19). It was undisputed that Wada never spoke to anyone at KPMG other than Cindy Holder, and there was no evidence that they discussed

Holder's passing the information to anyone in KPMG's upper management, like Mr. Middendorf. It was further undisputed that Wada had no knowledge of the way in which information that he allegedly passed along in March 2016 or January and February 2017 was used. For example, it was not even alleged that Wada was in any way aware of the 2016 re-reviews.

Accordingly, there was a factual basis for the requested multiple conspiracies instruction, and the Court should have included it in its charge to the jury in order to prevent a manifest injustice.

## CONCLUSION

For all of the reasons stated herein, the Court should enter a judgment of acquittal on Counts Two, Three, Four, and Five, or, alternatively, grant Mr. Middendorf an evidentiary hearing and a new trial.

Dated: April 12, 2019
New York, New York

Respectfully submitted,

PETRILLO KLEIN & BOXER LLP

By: /s/ Nelson A. Boxer

Nelson A. Boxer
Amy Lester
Alexandra R. Clark
Noam Greenspan
655 Third Avenue
New York, NY 10017
Telephone: (212) 370-0330
nboxer@pkbllp.com

BRUCH HANNA LLP
Gregory S. Bruch
Khiran Sidhu (*pro hac vice*)
1099 New York Ave., NW
Washington, DC 20001
Telephone: (202) 969-1630
gbruch@bruch-hanna.com

*Attorneys for David Middendorf*